**Gilbert C. WAITE, Appellant,**

v.

**Louis JACOBS.**

**No. 24183.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1971.

Decided March 8, 1973.

Milton A. Kallis, Washington, D. C., for appellant.

Charles H. Roistacher, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and John T. Kotelly, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

McGOWAN, Circuit Judge:

Appellant was civilly committed to Saint Elizabeths Hospital, an institution for the mentally ill, in 1952. He eloped in 1953, and, according to the Government's brief, was thereafter "discharged from the rolls" of the hospital. In September, 1958, however, appellant was again committed to Saint Elizabeths, having been found incompetent to stand trial on a charge of assault with a dangerous weapon. He was subsequently certified to be competent and, in February of 1961, was tried by the court without a jury and found not guilty by reason of insanity. Under the procedures in force at that time, his insanity acquittal resulted in automatic commitment to Saint Elizabeths; and he has

been confined there ever since.[1] This appeal concerns his petition for habeas corpus, which was instituted in October, 1969, and denied in March, 1970, by the District Court, which found that *"petitioner has not carried his burden of proof* and that he continues to have a mental illness and that if released he would be a danger to himself and others."* (Emphasis added.)

 Appellant advances numerous arguments on this appeal, some of which have become moot,[2] and others with which we do not agree.[3] He does, however, raise the question of which side should bear the burden of proof in cases of this nature, contending that the Government should be made to justify his continued confinement, rather than his being made to prove eligibility for release. Although we find no occasion to question the long-standing rule that the burden of proof is on the petitioner in habeas corpus proceedings, *see* Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642, 653 (1968), we conclude that, in the special circumstances of this case, appellant's claim may have merit; and we re-

mand so that the District Court may consider the problem.

Two facts are central to this result. First, appellant's 1961 trial occurred prior to our decision in Bolton v. Harris, which held that persons acquitted by reason of insanity (hereinafter "acquitees") must, prior to indeterminate commitment, be given a judicial hearing "substantially similar" to the one afforded persons who are civilly committed (hereinafter "commitees"). Since *Bolton* was applied only prospectively, we must assume that appellant was subject to pre-*Bolton* procedures, whereby acquitees were automatically confined for an indefinite term, *i. e.,* until they could obtain a court order for their release, based on either the certification of the hospital superintendent that they no longer required treatment or on a successful habeas petition. Second, the maximum sentence which might have been imposed had appellant been convicted was ten years. 22 D.C.Code § 502. Thus, as of the date of the hearing on his habeas petition, appellant had been confined for over nine of the ten years

---

1. Appellant eloped from the hospital and was absent for several days in 1962. At oral argument, counsel informed us that appellant now spends much time away from the hospital grounds under a conditional release. Appellant remains on the rolls of Saint Elizabeths, however, and, according to the Assistant United States Attorney who appeared before us, returns to John Howard Pavilion each night to sleep. The issue of the validity of appellant's continued confinement, therefore, has not been mooted.

2. Appellant's conditional release, *see* note 1, *supra,* has mooted his claim that he was improperly confined in the hospital's maximum security facility, as well as his contention that he was receiving inadequate treatment.

3. Appellant attacks the Government's psychiatric testimony on a variety of grounds. He asserts that much of it was based on unverified reports from nurses and ward attendants, or on hospital records which were unauthenticated, inadmissible, and incomplete. Reliance by a doctor on reports from his staff was, however, approved by this court in Brown

v. United States, 126 U.S.App.D.C. 134, 375 F.2d 310, 318 (1967); and the admissibility of hospital records is settled in this jurisdiction by Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617, 626 (1969). As for the alleged incompleteness of those records, that is something which we cannot consider without being able to examine the records themselves. Although he could have done so under Covington v. Harris, *supra* at 626, appellant's counsel chose not to introduce those documents into evidence, reasoning, as he explained at oral argument, that the trial court should not be burdened with "a lot of anonymous hearsay." The hospital documents are therefore not part of the record on appeal; and, while we reiterate the importance of detailed record-keeping, *id.* at 627, we hold that the issue of their completeness is not properly before us.

Appellant also urges that the Government's psychiatric testimony was conclusory, and that it was based on inadequate diagnoses and examinations. We have found nothing in the record, however, which would require reversal on either of those grounds.

for which he might have been sentenced criminally, and his maximum sentence period had ended long before this appeal was taken under submission.

In addition to these two facts, our view that the Government may perhaps be required to bear the burden of justifying appellant's continued commitment rests on the assumption that the sole legal basis for his confinement over the past twelve years has been his 1961 insanity acquittal. It is possible, however, that the 1952 civil commitment order retains vitality, and could support appellant's confinement even in the absence of the insanity acquittal.[4] Given the statement in the Government's brief that appellant was "discharged from the rolls" of Saint Elizabeths after his 1953 escape, that possibility seems remote in the light of Gillis v. Cameron, 116 U.S. App.D.C. 387, 324 F.2d 419 (1963); and the discussion below therefore assumes that the 1952 order has no present effect, that is to say, appellant is no different from other pre-*Bolton* acquitees.[5] We do not, however, preclude the possibility that there are facts which would render *Gillis* distinguishable; and upon remand the Government is free to develop them, or to otherwise argue that appellant's 1952 civil commitment removes his case from the scope of the rule of law which may be found to be operative.

I

On these facts and assumptions, we are faced with a man who has been deprived of his liberty for well over a decade by virtue of the fact that a court, sitting without a jury in 1961, had a reasonable doubt about his sanity at the time in 1958 when he committed an act prohibited by the criminal law.[6] At no time since has the Government had to bear the burden of proving, even by a preponderance of the evidence, that he is mentally ill and dangerous. It is true that appellant has had the opportunity, in hearings on habeas petitions, to affirmatively prove that he is neither. But, especially in cases concerning psychiatric testimony, which is "often unclear, sometimes woefully muddled," United States v. Leazer, 148 U.S.App.D. C. 356, 460 F.2d 864, 866 (1972), the allocation of the burden of proof can be outcome determinative.

■ Our concern, however, is not with any procedural defect which might be found when a pre-*Bolton* acquitee's commitment is viewed in isolation. The crucial fact is that other persons confined in mental hospitals—namely, committees—have been given the benefit of more stringent procedural safeguards.[7] This difference in the treatment of two classes of mental patients has led us to scrutinize appellant's claim under the Equal Protection Clause, as interpreted in several recent Supreme Court decisions. It seems to us that, after the expiration of the period for which an acquitee might have been incarcerated had he been convicted, it may be irrational, within the meaning of equal protection doctrine, to distinguish between an acquitee and a committee. Acquitees who have been confined for that period, therefore, may be entitled to treatment no different from that afforded committees. Such a constitutional entitlement would necessitate that appellant be given a hearing at which the Government, in

---

4. As noted above, appellant's arrest in 1958 occurred while he was at large subsequent to his 1953 elopement.

5. The Government does not argue that the 1952 order retains vitality; and the District Court clearly assumed that the insanity acquittal was the basis for appellant's commitment.

6. The recent amendment to the D.C.Code which purports to require that insanity be established by a preponderance of the evidence, 24 D.C.Code § 301(j) (1967 ed., Supp. V, 1972), is not applicable to this case; and we express no views with respect to it.

7. Of course, post-*Bolton* acquitees have also been given the benefit of more stringent procedural safeguards; but the discrimination between pre- and post-*Bolton* acquitees is sanctioned by the prospectivity holding of *Bolton* itself.

order to justify his continued confinement, would have to bear the burden of proof on the issues of mental illness and dangerousness.

## II

There are two differences between acquitees and commitees, both relating to the fact that the former have committed the physical elements of a crime, which might be thought to justify treating them differently *for purposes of initial commitment*. Neither distinction, however, would seem to have force after the expiration of the maximum sentence period.[8]

First, as Judge Leventhal noted in his concurrence in Dixon v. Jacobs, 138 U.S.App.D.C. 319, 427 F.2d 589, 603–604 (1970), a person who is acquitted by reason of insanity may "have meaningful elements of responsibility for the offense, even though there is enough doubt to obviate a verdict of guilty." Such an acquittal means only that there was a reasonable doubt concerning the defendant's sanity at the time he committed a prohibited act. It is possible that he was sufficiently sane to have criminal responsibility; indeed, under the applicable standard, it may be more likely than not.

Moreover, "meaningful elements of responsibility" may exist even in those cases in which the jury is certain that the defendant was not "sufficiently responsible." The insanity defense is not a matter of black and white—there is not a precise psychological line separating absolute free will from absolute uncontrollability. Rather, the defense is based on a balance between mental disease and self-control, the law having determined that a person should not be found guilty when the former is such that the latter becomes, not non-existent,

but merely "substantially impaired." McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 (1962). Even those defendants who are "legally insane" to a "certainty," in other words, may have some control over their behavior, and therefore may possess some "meaningful elements of responsibility for the offense."

■ While that possibility might have relevance for purposes of initial commitment procedures, it would seem to have none after the maximum sentence period. *See Dixon, supra,* at 604 (Leventhal, J., concurring). After confinement for that term, and in most cases much earlier, even a person who was fully accountable for a crime is free to rejoin the community. It follows, therefore, that the acquitee's substantially lesser responsibility should have no bearing on his continued confinement after the maximum sentence period. That is not to say that the acquitee must be released even if he is mentally ill and dangerous, but rather that his continued confinement, and the procedures governing it, cannot be justified by reference to his partial responsibility for a prohibited act.

The second difference between acquitees and commitees, which might be thought to justify different treatment of the two classes, is that the former have "already unhappily manifested the reality of anti-social conduct," *Dixon, supra* at 604, and might therefore be considered demonstrably more dangerous than the latter. *See* Overholser v. O'Beirne, 112 U.S.App.D.C. 267, 302 F.2d 852, 859 (1962). An analysis of several recent Supreme Court opinions, however, suggests that that difference may not justify discrimination against an acquitee who has been confined for the maximum sentence period.

---

8. In alluding to these possible distinctions, we are not called upon in this case to express any opinion as to what, if any, discriminations in the initial commitment decision, between commitees and acquitees, are permitted or required by the Constitution. On the record before us we deal only with a pre-*Bolton* acquitee whose commitment to a mental institution has now lasted longer than the maximum sentence which could have been imposed had he been found guilty. *Compare* United States v. Brown 155 U.S.App.D.C. —, 478 F.2d 606 (1973).

The first in this line of cases is Baxstrom v. Herold, 383 U.S. 107, 86 S. Ct. 760, 15 L.Ed.2d 620 (1966), which concerned a New York statute providing that a state prisoner could, at the end of his sentence, be civilly committed without the jury trial afforded all other commitees, and could thereafter be sent to a special hospital for the dangerously insane without the hearing normally prerequisite to such confinement. The state argued "that it is reasonable to classify persons in Baxstrom's class together with those found to be dangerously insane since such persons are not only insane but have proven criminal tendencies as shown by their past criminal records." *Id.* at 114, 86 S.Ct. at 764. The Supreme Court found that contention to be "untenable," *id.*, noting:

> Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all.* For purposes of granting judicial review before a jury of the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments.

*Id.* at 111–112, 86 S.Ct. at 763. (Emphasis in original.)

In light of this language, this court has read *Baxstrom* as turning, not on the fact that Baxstrom was nearing the end of his sentence, but on the assumption that "dangerousness is not relevant to the *procedures* for determining whether a 'person is mentally ill *at all.*' . . . *Baxstrom* thus might be said to require the conclusion that, while prior criminal conduct is relevant to the determination whether a person is men-

tally ill and dangerous, it cannot justify denial of procedural safeguards for that determination." Cameron v. Mullen, 128 U.S.App.D.C. 235, 387 F.2d 193, 201 (1967). (Emphasis in original.)[9] Read in this manner, *Baxstrom* would seem to indicate that no procedural discrimination against acquitees can be justified on the ground that they have "already unhappily manifested the reality of antisocial conduct."

A second Supreme Court case, decided as recently as the 1972 Term, appears to point in the same direction. Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). Humphrey had been convicted in a Wisconsin state court of contributing to the delinquency of a minor, a misdemeanor entailing a one-year maximum sentence. In lieu of sentence, he was committed to a "sex deviate facility" in the state prison, pursuant to the Wisconsin Sex Crimes Act. Wis.Stat.Ann. § 959.15 (1958), as amended, Wis.Stat.Ann. § 975 (1971). Under that statute, commitment to the sex deviate facility can be authorized for an initial term equal to the maximum sentence which might be imposed for the defendant's crime. After the maximum sentence period, the state can obtain five-year renewals, on the basis of a showing of dangerousness, made before a judge sitting without a jury. Humphrey challenged such a renewal order, obtained at the expiration of his one-year maximum sentence period.

In remanding the case for the evidentiary hearing which had been denied by the District Court, the Supreme Court noted (at pp. 510–511, 92 S.Ct. at p. 1052, footnotes omitted) that "[c]ommitment for compulsory treatment under the Wisconsin Sex Crimes Act appears to require precisely the same kind of determination" as compulsory civil commitment under the state's Mental Health Act (which provides for a jury determination of the conditions for commit-

9. The Second Circuit, quoting from *Cameron*, rendered a similar interpretation of *Baxstrom* in United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir. 1969).

ment), and "inquire[d] what justification exists for depriving persons committed under the Sex Crimes Act of the jury determination afforded to persons committed under the Mental Health Act." Citing *Baxstrom,* the Court indicated that Humphrey's dangerous conduct could not justify such procedural discrimination after the maximum sentence period had expired:

> [The State] seeks to justify the discrimination on the ground that commitment under the Sex Crimes Act is triggered by a criminal conviction; that such commitment is merely an alternative to penal sentencing; and consequently that it does not require the same procedural safeguards afforded in a civil commitment proceeding. That argument arguably has force with respect to an initial commitment under the Sex Crimes Act, which is imposed in lieu of sentence, and is limited in duration to the maximum permissible sentence. The argument can carry little weight, however, with respect to the subsequent renewal proceedings, which result in five-year commitment orders based on new findings of fact, and are in no way limited by the nature of the defendant's crime or the maximum sentence authorized for that crime.

■ *Humphrey* clearly indicates that *Baxstrom,* which concerned a prisoner, applies fully to the situation of an acquitee who has been confined for the maximum sentence period. Insofar as the initial commitment is concerned, we can perceive little difference between Humphrey and an acquitee. Humphrey was found to have performed an anti-social act and was given compulsory treatment in lieu of sentence, after a determination apparently identical in nature with that required under a civil commitment statute. An acquitee, similarly, has been found to have performed an anti-social act and is given compulsory

treatment after a proceeding "substantially similar" (Bolton) to the one afforded commitees. The circumstance that Humphrey was committed in lieu of sentence, while an acquitee is committed "in lieu of conviction," does not detract from the essential similarity of the two commitments. Thus, *Humphrey* may well be viewed as embracing the proposition that procedural discrimination against acquitees because of their demonstrated dangerous propensities is prohibited in re-commitment proceedings. *See also* Matthews v. Hardy, 137 U.S. App.D.C. 39, 420 F.2d 607 (1969), cert. denied, 397 U.S. 1010, 90 S.Ct. 1231, 25 L.Ed.2d 423 (1970).

Appellant, however, is not the subject of re-commitment proceedings as such. His 1961 commitment, unlike Baxstrom's and Humphrey's, was for an indefinite term. A question arises, therefore, as to the reach of *Baxstrom* and *Humphrey* to the situation of continued, as opposed to renewed, confinement. It might be argued, initially, that *Humphrey* is directly applicable to the issue of indefinite commitment itself, and that it requires that the initial confinement be limited to the maximum sentence period. Thus, it might seem that the result in that case would have been no different if the Wisconsin statute, instead of authorizing a fixed initial term with renewals, had provided that the initial commitment be indefinite. Renewal proceedings with inadequate safeguards are surely better than no renewal proceedings at all; and, since the Court found constitutional fault in the former, a similar holding as to the latter may be implicit.[10]

Such a conclusion is not ineluctable, however, as the Court has occasionally invalidated discriminations operative in a procedural context without reaching the question of whether the procedure

---

10. It should be noted, moreover, that the Court, in discussing the state's asserted justification in the passage excerpted above, granted its "arguable force" only

"with respect to an initial commitment . . . limited in duration to the maximum permissible sentence."

itself is constitutionally required.[11] We therefore intimate no view on the constitutionality *per se* of an acquitee's indeterminate commitment, either under *Humphrey* or under traditional due process concepts.[12] Whether or not *Humphrey* is directly applicable to the issue of indefinite commitment of acquitees, however, a subsequent Supreme Court decision, *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), suggests that the *Baxstrom* rationale applies to appellant, even though his case concerns continued, rather than renewed, commitment.

██ Jackson, a mentally defective deaf mute, was committed to a mental hospital as incompetent to stand trial on a charge of robbery. Noting that "[t]here is nothing in the record that even points to any possibility that Jackson's present condition can be remedied at any future time," the Court concluded that Jackson's commitment was "permanent in practical effect." Although the procedural safeguards at Jackson's commitment hearing were "substantially similar" to those available under state statutes providing for indeterminate civil commitment, the Court found a violation of equal protection in the fact that, under the terms of Jackson's commitment, he could obtain release only by meeting a standard more stringent than those applicable to persons not charged with criminal offenses:

> *Baxstrom* did not deal with the standard for release, but its rationale is applicable here. The harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others af-

ford him a substantial opportunity for early release.

406 U.S. at 729, 92 S.Ct. at 1853.

Thus, *Jackson* expressly holds that *Baxstrom* is applicable to the problem of release from indefinite confinement, even though re-commitment proceedings are not contemplated by statute. Read together, then, *Humphrey* and *Jackson* indicate that, once the maximum sentence period has expired, it is unconstitutional to discriminate against an acquitee, as compared with a committee, for purposes of release from indefinite commitment. From that moment on, acquitees and committees appear, in the Court's contemplation, to be on the same footing.

Assuming the correctness of this analysis, the issue is whether appellant, in seeking release from confinement, is on an equal footing with a committee. It is not dispositive to point to the fact that the relevant statutory provisions, as judicially construed,[13] provide that both acquitees and committees can obtain release through petitions for habeas corpus, and that the burden of proof on the issues of mental illness and dangerousness is, in either case, on the petitioner. The reason that equal protection may be violated despite such apparent similarity of treatment is that placement of the burden of proof on the habeas petitioner, while rationally justifiable in the case of a committee, may be irrational with respect to appellant for the reason that just as it is unconstitutional to place a burden on only one of two similarly situated persons, so also may it be irrational to place similar burdens on persons situated differently.

The rational justification for placing the burden of proof on a committee is

---

11. *See, e. g.,* Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

12. *See* Ragsdale v. Overholser, 108 U.S. App.D.C. 308, 281 F.2d 943, 950 (1960) (Fahy, J., concurring). In McNeil v. Director, Patuxent Institution, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), the Supreme Court noted that "lesser [procedural] safeguards may be

appropriate" when commitment is for "a limited purpose"; but indicated that "by the same token, the duration of the confinement must be *strictly limited* [by reference to the purpose]." *Id.* at 249–250, 92 S.Ct. at 2087.

13. 24 D.C.Code § 301, as construed in Bolton v. Harris, *supra,* at p. 653 of 395 F.2d.

that his mental illness and dangerousness have previously been convincingly established. In light of those established facts, the law gives effect to a presumption of continuity of status. It comports with normal perceptions of reality—and hence is rational—to assume that, once a given status is proven to exist, it continues to do so in the absence of evidence showing the contrary to be more likely than not.

The presumption of continuity of status, however, cannot operate with respect to a pre-*Bolton* acquitee, because he has not been proven to be mentally ill and dangerous. He and a committee are, in that respect, differently situated; and it would seem to offend equal protection to place upon him a burden which can justifiably be placed on a committee only by reference to the differentiating characteristic.[14]

### III

If appellant is constitutionally entitled to be put on an equal footing with committees, as the foregoing considerations suggest, then it would seem that he has a right to a hearing, with all the procedural safeguards available in civil com-

mitment proceedings, at which the Government must bear the burden of proof on the issues of his mental illness and dangerousness.[15] The fact that appellant committed the physical elements of a crime in 1958 would, of course, be relevant *evidence* admissible at the hearing. The time seems past, however, when that act can be accorded more than evidentiary significance.[16]

While it appears that strong constitutional arguments can be made in support of the granting of the above-mentioned relief to appellant, we do not now so hold. Since the arguments were not made in appellant's brief or at oral argument (indeed, both *Humphrey* and *Jackson* were decided subsequent to oral argument), the Government has had no opportunity to respond to them. Therefore, we limit ourselves to the suggestion that, for the reasons developed above, appellant may be entitled to have the Government bear the burden of proof on the issues of mental illness and dangerousness; and we remand for a full consideration of the problem, including, if necessary, additional evidentiary inquiries.[17]

14. The practical importance of this concept can perhaps be illustrated by assuming the cases of two persons about whom the evidence as to mental illness is, always has been, and always will be, inconclusive—it cannot be, said with reasonable certainty that either is, or is not, mentally ill. Person number one is a pre-*Bolton* acquitee. Because there was reasonable doubt about his sanity, he was acquitted of a criminal charge and automatically committed for an indefinite term. Because he cannot establish his sanity, he will never obtain his release under the present rule. Person number two is walking the streets. The Government once attempted to commit him civilly; because the evidence was inconclusive, however, that attempt failed.

Clearly, *Baxstrom*, *Humphrey*, and *Jackson* mean that both persons must be treated equally after the expiration of number one's maximum sentence period. Under present procedures, however, that will not be the case: Number two will never see the inside of a mental hospital, and number one will never see the outside.

15. This would leave undisturbed the traditional rule that the burden of proof is on

the petitioner in habeas corpus proceedings, and the application of that rule by *Bolton, supra,* at 653, to habeas petitions brought by committees and post-*Bolton* acquitees. So long as the status of mental illness has previously been proven to exist, the presumption of its continuity can, as noted above, rationally justify the traditional rule. Thus, once an acquitee is proven to possess the prerequisites for commitment, the burden of proof will be on him in any subsequent habeas proceedings.

16. To the extent that statements in Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960), and Overholser v. O'Beirne, 112 U.S.App.D.C. 267, 302 F.2d 852 (1961), are inconsistent with this theory, we must again recognize, as we did in *Bolton, supra,* at 653 of 395 F.2d, that modification of those decisions may be required by supervening Supreme Court authority.

17. We have couched our discussion largely in terms of the allocation of the burden of proof for the reason that that is the issue raised by appellant on this appeal. On remand it will be open to him to make

The District Court should initially resolve the question of the continued vitality of appellant's 1952 civil commitment order. If it determines that the answer is as we have assumed it to be, it should then address the constitutional issues posed above, allowing counsel for both parties to address themselves to them.[18]

The case is remanded to the District Court for further proceedings in the light of this opinion.

It is so ordered.

such contentions as he sees fit with respect to the precise scope of the procedural rights, including the availability of jury trial, which he may believe to be required. If a jury trial is mandated by the Constitution, the habeas procedure should be adaptable enough to be conformed to that need. Our so-called *Bolton* hearing, for example, fits no exact statutory or common law pattern, and demonstrates that,

in this field at any rate, the forms of action are flexible.

18. Since appellant is a pre-*Bolton* acquitee, the District Court will not be faced with the question of whether the considerations we have adverted to apply to post-*Bolton* acquitees whose maximum sentence periods have expired.