Michael A. JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 11918.

District of Columbia Court of Appeals.

Argued Dec. 5, 1977.

Decided Nov. 28, 1978.

Silas J. Wasserstrom, Public Defender Service, Washington, D. C., with whom Alan F. Greenwald, Public Defender Service, Washington, D. C., was on the brief, for appellant.

Joel S. Perwin, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before KELLY, MACK and FERREN, Associate Judges.

FERREN, Associate Judge:

■ The trial court found appellant Michael Jones not guilty of petit larceny by reason of insanity. After a "release hearing," D.C.Code 1973, § 24–301(d), the court committed Mr. Jones indefinitely to St. Elizabeths Hospital. This case presents one question: whether Michael Jones is constitutionally entitled to release from St. Elizabeths upon expiration of the maximum period for which he could have been imprisoned (in this case one year), unless the government carries the burden of proving, at a civil commitment hearing, D.C.Code 1973, § 21–545(b), that Mr. Jones is still mentally ill and dangerous to self or others.

Appellant does not challenge the validity of his initial commitment to St. Elizabeths after the "release hearing." On the assumption, therefore, that this commitment was lawful, we can perceive no constitutional requirement that appellant be released or civilly committed at the end of the maximum imprisonment period, for that period bears no relationship to the unchallenged basis for appellant's hospital confinement: that he is mentally ill, is dangerous to self or others, and should receive treatment until he is well enough for release. We therefore affirm the denial of appellant's motion for civil commitment or release.

## I.

On September 19, 1975, the police arrested Michael Jones for attempting to steal a coat from a department store. The next day the government charged him with attempted petit larceny; and, following a competency examination yielding a finding of mental illness, he was arraigned and ordered to St. Elizabeths for mental observation pursuant to D.C.Code 1973, § 24–301(a). He remained in the District of Columbia jail for four and one-half months until bed space became available at St. Elizabeths on February 4, 1976.

Following the observation period, appellant went to trial on stipulated facts. In an uncontested proceeding, the trial judge entered a judgment of not guilty by reason of insanity. Thereafter, he recommitted appellant to St. Elizabeths temporarily, pursuant to D.C.Code 1973, § 24–301(d)(1). On May 25, 1976, appellant was afforded his § 24–301(d)(2) "release hearing," at which the court determined that he was mentally ill and likely to be dangerous to himself or others in the reasonable future. The court accordingly continued his commitment to St. Elizabeths—indefinitely.

At this juncture the procedural history of the case becomes murky. Apparently, upon conclusion of the May 25 proceeding, the court ordered a further hearing for November 29, 1976. When that date arrived appellant's counsel appeared before Judge Hamilton and orally requested that appellant be released—or civilly committed—since his cumulative hospital confinement had exceeded the one-year maximum period of incarceration for attempted petit larceny. No attorney appeared for the government. The judge responded with an order that the government either pursue civil commitment or show cause why the "criminal commitment" should not be vacated by January 18, 1977.

During the seven-week period which followed, it appears that the government initiated the civil commitment process—resulting in a recommendation of such commitment by the staff of St. Elizabeths—and then changed course, deciding to contest the court's order. The government persuaded the court to modify its order by requiring appellant to file a written motion for civil commitment or release, and by allowing the government time to respond.

The matter came on for hearing on February 22, 1977. After extended argument, the court denied appellant's motion and reaffirmed the findings of May 25, i. e., that appellant was mentally ill and likely to be dangerous. Appellant noted an appeal and, on June 14, 1977, filed a motion in this court for summary reversal. The government responded with a motion for summary affirmance. The motions division of this court rejected both requests for summary disposition. Instead, we ordered expedited oral argument on the appeal. After argument before this division of the court, we called for post-argument briefs.

In his final brief, appellant confirms the narrow scope of the question presented in this appeal. "[A]ppellant's position has been, and remains, . . . that *even if* an automatic commitment following an insanity acquittal is *permissible*, continued confinement beyond a certain point of time—at the latest when the prison sentence which could have been imposed had the defendant been convicted has run—is constitutionally *impermissible* unless the government can prove the necessity of such continued confinement just as it would have to prove the necessity where it seeks civil commitment" (emphasis in original). Thus,

we are not confronted with a challenge to the process for initial commitment which ordinarily follows an insanity acquittal. We are faced only with the constitutional propriety of hospitalization beyond the period of a maximum prison term, absent invocation of the protections of the civil commitment process.

## II.

According to appellant, the principles of *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), *Bolton v. Harris*, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968), and, more directly, *Waite v. Jacobs*, 154 U.S.App.D.C. 281, 475 F.2d 392 (1973), mandate a conclusion that the equal protection clause is transgressed when insanity acquitees are held beyond their maximum potential terms of imprisonment without the intervention of civil commitment procedures.[1] To comprehend his argument fully, a brief history is in order.

Prior to the circuit court's 1968 *Bolton* decision, a successful insanity plea resulted in automatic, indeterminate confinement to a mental hospital. Because there was no required judicial review of such confinements, the "statutory scheme would [have] conceivably allow[ed] a patient committed under [D.C.Code 1967, § 24-301(d)] to remain in the hospital for the rest of his life without a judicial determination that he [was] mentally ill or that he [was] still likely to commit dangerous acts." *Bolton, supra*, 130 U.S.App.D.C. at 7, 395 F.2d at 648. At that time, however, as today, the 1964 Hospitalization of the Mentally Ill Act, D.C.Code 1973, §§ 21–541 to –545, provided numerous protections for civilly committed persons—including, significantly, the right to a jury trial with the burden on the government to prove mental illness and dangerousness beyond a reasonable doubt.

In *Bolton*, therefore, the circuit court explored the "sharp contrast" between the two commitment schemes in light of the Supreme Court's *Baxstrom* principle "that the commission of criminal acts does not give rise to a presumption of dangerousness which, standing alone, justifies substantial difference in commitment procedures and confinement conditions for the mentally ill." *Bolton, supra* at 6, 395 F.2d at 647. Concluding that the differences between the two groups, insanity acquitees and civil commitees, could not constitutionally support most of the differences in procedure, the court read most of the 1964 Act's civil commitment safeguards into the "insane criminal" commitment scheme.[2] Thereafter, acquitees were entitled to a *"Bolton* hearing" after trial: "a judicial hearing with procedures substantially similar to those in civil commitment proceedings." *Id.* at 10, 395 F.2d at 651 (footnote omitted).

In 1970, however, Congress responded to the *Bolton* decision by amending § 24–301 of the D.C.Code. Dissatisfied with the anticipated consequences of *Bolton,* Congress attempted to accommodate the acquitee's constitutional rights and provide rehabilitative opportunities while protecting the public against anticipated danger. *United States v. Jackson*, 179 U.S.App.D.C. 375, 381, 553 F.2d 109, 115 (1976). By the terms of the amended, and currently applicable, § 24–301, an insanity acquitee once again faces automatic commitment:

> If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e). [D.C.Code 1973, § 24–301(d)(1).]

---

1. The Fifth Amendment's due process clause includes an equal protection safeguard against federal and District of Columbia governmental actions. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Davis v. Washington*, 168 U.S.App.D.C. 42, 43 n.2, 512 F.2d 956, 957 n.2 (1975), *rev'd on other grounds*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

2. The court expressly permitted two distinctions to continue: (1) automatic, temporary commitment of acquitees and (2) mandatory court review of a hospital's release decision for acquitees. *Bolton, supra* at 10–11, 395 F.2d at 651–52.

The next paragraph of the statute, however, eliminates the pre-*Bolton* possibility of indeterminate commitment without judicial review. Congress provided for an automatic, legislatively tailored "release hearing" within 50 days of the § 24–301(d)(1) commitment:

> ‚A person confined pursuant to paragraph (1) shall have a hearing unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody. . . . If the hearing is not waived, the court shall cause notice of the hearing to be served upon the person, his counsel, and the prosecuting attorney and hold the hearing. Within ten days from the date the hearing was begun, the court shall determine the issues and make findings of fact and conclusions of law with respect thereto. [D.C.Code 1973, § 24–301(d)(2), in relevant part.]

Additionally, the 1970 amendments provided for habeas corpus relief, § 24–301(g), as well as for a more specific motion mechanism for seeking release (no more often than every six months), § 24–301(k).

As we have noted, however, the major impetus for legislative action was anxiety about the *Bolton* limitation on the ability to continue commitment of those who successfully interpose insanity defenses to criminal charges. Thus, for our purposes here, the most notable features of the 1970 amendments are not the new procedures afforded acquitees but the omitted or retracted guarantees which had been extended by the *Bolton* decision. It is the differences between the post-1970 "modified *Bolton*" scheme under which appellant was committed and has continued to be confined, D.C. Code 1973, § 24–301, and the current civil commitment processes, D.C.Code 1973, § 21–501 *et seq.,* which had been · extended to acquitees by *Bolton,* that must be the focus of our equal protection analysis. These differences are substantial.

Civil commitees have "commitment hearings" at which the government bears the burden of proving "mental illness" and likelihood of injury to "himself or other persons" beyond a reasonable doubt. D.C.Code 1973, § 21–545(b); *In re Ballay,* 157 U.S. App.D.C. 59, 482 F.2d 648 (1973). In contrast, at a § 301(d)(2) "release hearing," the acquitee must carry the burden of demonstrating by a "preponderance of the evidence" that he "has recovered his sanity" and "will not in the reasonable future be dangerous to himself or others." D.C.Code 1973, §§ 24–301(d)(2), –301(e). The civil commitment process affords a jury, § 21–545; the acquitee "release hearing" process does not. *See* § 24–301. Release of a civil commitee does not require court supervision, § 21–546, whereas the court retains the last word for acquitees, § 24–301(e). The civil scheme furnishes regular six-month review initiated by the hospital, § 21–548, while the scheme for acquitees mandates review only upon a motion for relief. § 24–301(k), or petition for habeas corpus, § 24–301(g), initiated by the patient (while permitting review initiated by the hospital, § 24–301(e)).

Appellant maintains that even if the rationale for different commitment procedures is valid,[3] it must expire at a time no later than the end of the maximum prison term which could have resulted from criminal conviction. His claim, in effect, is that the running of the potential prison term activates *Baxstrom* and *Bolton* principles which entitle him, at that time, to additional safeguards. We therefore turn to the merits of appellant's claim.

---

**3.** Although the issue has not been resolved, there has been much discussion concerning the propriety of the 1970 insanity commitment amendments and their vulnerability to a new *Bolton*-type challenge. *See United States v. Jackson, supra* at 382 n.13, 553 F.2d at 116 n.13; *United States v. Wright,* 167 U.S.App. D.C. 309, 311 n.9, 511 F.2d 1311, 1313 n.9 (1976); *Johnson v. Robinson,* 166 U.S.App.D.C. 62, 66 & n.18, 509 F.2d 395, 399 & n.18 (1977); *United States v. Brown,* 155 U.S.App.D.C. 402, 404 & n.3, 478 F.2d 606, 608 & n.3 (1973). *See generally Bethea v. United States,* D.C.App., 365 A.2d 64, 92 & n.62 (1976) (considering the propriety of the 1970 amendments), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *United States v. Ecker,* 177 U.S. App.D.C. 31, 47–52, 543 F.2d 178, 194–99 (1976) (same), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977).

## III.

The United States Court of Appeals for the District of Columbia Circuit has given a measure of judicial endorsement to appellant's theory in *Waite v. Jacobs, supra.* In *Waite,* a pre-*Bolton* acquitee who could not reap *Bolton's* prospective benefits, *Bolton, supra,* 130 U.S.App.D.C. at 12–13, 395 F.2d at 653–54, made essentially the same claim that appellant makes here. The circuit court found merit in this equal protection claim. The court observed that

> after the expiration of the period for which an acquitee might have been incarcerated had he been convicted, it may be irrational, within the meaning of equal protection doctrine, to distinguish between an acquitee and a committee. Acquitees who have been confined for that period, therefore, may be entitled to treatment no different from that afforded committees. [*Waite v. Jacobs, supra,* 154 U.S.App.D.C. at 284, 475 F.2d at 395.]

The court then stated the issue to be "whether appellant, in seeking release from confinement, is on an equal footing with a committee," *id.* at 288, 475 F.2d at 399, or, as a matter of law, is situated differently from a committee. Adverting to the radical differences in initial treatment (pre-*Bolton* v. civil commitment), the court perceived that pre-*Bolton* acquitees and committees were not on equal footing; it then opined that equal protection might well be transgressed in Waite's case, for "just as it is unconstitutional to place a burden on only one of two similarly situated persons [the traditionally accepted meaning of equal protection], *so also may it be irrational to place similar burdens on persons situated differently."* *Id.* (emphasis added). The court concluded, "it would seem that [appellant] ha[d] a right to a hearing, with all the procedural safeguards available in civil commitment proceedings." *Id.* at 289, 475 F.2d at 400. Because, however, there was a possibility that Waite's commitment actually was attributable to a civil commitment which had preceded the criminal action, and because the court's novel equal protection analysis had not been briefed or argued, the court did not order specific relief; instead, it remanded the case to the district court for further proceedings.

It is this novel, call it "equalization," theory of equal protection which appellant invokes here—a theory that equal treatment of the two groups, committees and acquitees, eventually requires remedial *i. e.,* compensating, procedures for acquitees because their initial commitments were more perfunctory. For several reasons, however, we have concluded that the *Waite* analysis is inapplicable to this case.[4]

In the first place, Waite's situation is factually distinguishable from that of appellant Jones. Waite, a pre-*Bolton* acquitee suffered from the "no judicial review" (save habeas corpus) system condemned in *Bolton.* He had been automatically, indefinitely committed as presently ill and dangerous because he successfully raised a mere reasonable doubt about his legal sanity at the time of committing the offense.[5] Because

---

4. At least two subsequent circuit court opinions have mentioned *Waite* approvingly. Only one, however, definitely approved the "equalization" approach to an equal protection challenge, *see Johnson v. Robinson, supra,* and the expression of approval in *Johnson* is dicta. (The court, observing that appellant wished the "constitutional suggestion" of *Waite* transformed into a holding, required appellant first to present his *Waite*-based argument to the local District of Columbia courts.) In *United States v. Ecker, supra,* 177 U.S.App.D.C. at 52, 543 F.2d at 199, the court reaffirmed *Waite's* "equal footing" conclusion; *i. e.,* that at the end of the maximum period for which acquitees could have been sentenced, no differentiation is acceptable between them and committees. A similar analysis was also espoused in a few cases decided before *Waite. See United States v. Brown, supra,* 155 U.S.App.D.C. at 408, 478 F.2d at 612 (dictum); *Dixon v. Jacobs,* 138 U.S.App.D.C. 319, 334, 427 F.2d 589, 604 (1970) (Leventhal, J., concurring and dissenting). It is not clear, however, that those opinions adopted the "equalization" analysis mandating additional, remedial procedures for acquitees at that point.

5. For discussions of the irrationality of basing a finding of present mental illness on a previous doubt about sanity, *see United States v. Brown, supra,* 155 U.S.App.D.C. at 409, 478 F.2d at 613 (Wright, J., dissenting); *Bolton, supra,* 130 U.S. App.D.C. at 6, 395 F.2d at 647.

of the unfortunate circumstances of his pre-*Bolton* status, Waite had remained confined in a mental hospital without ever receiving constitutional, procedural protections.[6]

Jones, on the other hand, is a post-*Bolton*, post-1970 acquitee. Unlike Waite, Jones carried the burden at his criminal trial of proving by a "preponderance of the evidence" that he was insane at the time he committed the offense. D.C.Code 1973, § 24–301(j). In addition, while receiving less than a *Bolton* (civil commitment) hearing after the criminal trial, Jones did receive substantially more protection than Waite by virtue of the § 24–301(d)(2) "release hearing." Thus, upon Jones' indefinite commitment, he was in a factually different posture from Waite vis-a-vis civil commitees. *See Johnson v. Robinson,* 166 U.S.App.D.C. 62, 66, 509 F.2d 395, 399 (1974).

Second, at the time of indefinite commitment, Jones also was in a legally different posture from Waite vis-a-vis civil commitees. Because Waite was a pre-*Baxstrom,* pre-*Bolton* acquitee, his initial commitment was constitutionally invalid; the court accordingly found him, as a matter of law, "situated differently" from a civil commitee. *Waite, supra,* 154 U.S.App.D.C. at 288–89, 475 F.2d 399–400. Jones, to the contrary, proceeds from the premise that the § 24–301(d) safeguards in his release hearing were constitutionally sufficient to fill the historical gap in protection (upon initial commitment) between acquitees and commitees—the gap which persuaded the circuit court to assist Waite, and Bolton before him, on equal protection grounds.

The present case, therefore, is significantly different from *Waite,* which was a decision explicitly limited to pre-*Bolton* acquitees. *Waite, supra* at 285 n.8, 475 F.2d at 396 n.8. We are presented here with a much narrower question: whether, as a matter of equal protection, the differences in *valid* initial commitment procedures for acquitees and commitees are nevertheless significant enough to require a remedy for the acquitee at the expiration of the maximum period for which he could have been sentenced—a remedy granting him either his outright release or a second (this time purely civil) commitment proceeding. The constitutional rationale for such a remedy, assuming for argument's sake the validity of *Waite's* equalization theory for equal protection, would be that the post-1970 acquitee, like the pre-*Bolton* acquitee, has been "situated differently" from a commitee (while treated the same), despite the presumed validity of the respective initial commitment procedures. We therefore must examine whether, as a matter of law, situational differences can be said to exist upon confinement.

An acquitee's § 24–301 release hearing and a commitee's § 21–545(b) civil commitment hearing both purport to determine whether one is mentally ill and dangerous.[7] Thus, these respective procedures can result in differently situated confinees only if the acquitee's hearing results in a perversion of that determination when compared with a commitee's hearing.

One such perversion would be a determination derived, in part, by reference to the criminal offense.[8] Because appellant's con-

---

**6.** That the inequity of the situation may have influenced the court's reasoning is intimated by the *Waite* opinion, *Waite v. Jacobs, supra,* 154 U.S.App.D.C. at 284 n.7, 475 F.2d at 395 n.7, and by *Johnson v. Robinson, supra,* 166 U.S. App.D.C. at 63, 509 F.2d at 396, both of which referred to the "anomaly" created by *Bolton's* prospective application.

**7.** The determination for an acquitee is whether he "has recovered his sanity [and] . . . will not in the reasonable future be dangerous to himself or others." D.C.Code 1973, § 24–301(e). The determination for a potential commitee is whether "the person is mentally ill

and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty." D.C.Code 1973, § 21–545(b).

**8.** More particularly, one might argue that an acquitee's commitment is actually based on more than a mentally ill and dangerous finding—that the acquitee's burden to prove his sanity, without right to jury trial, reflects a punitive gloss derived from his previous criminal behavior. It would follow that an acquitee is situated differently from a commitee because this extra, punitive basis for commitment has permitted an abbreviated, more burdensome release hearing, resulting, arguably, in a less val-

finement after a § 24–301 release is not challenged, however, appellant must be presumed to agree that this confinement is not based, even in part, on punitive considerations; otherwise, it would be unconstitutional under *Baxstrom, supra; see Humphrey v. Cady,* 405 U.S. 504, 510–11, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *Waite, supra,* 154 U.S.App.D.C. at 285–86, 475 F.2d 396–97; note 8 *supra.* Therefore, absent any explanation as to why the § 24–301(d) release hearing results in lesser quality findings of illness and dangerousness than a § 21–545(b) civil commitment hearing, we must conclude that the findings are legally the same.

It is true, of course, that appellant's criminal offense is the reason why his confinement took place by way of § 24–301(d), not § 21–545(b). Thus, in order to be as clear as possible why it makes no legal difference in this case whether appellant was initially confined under the "insane criminal" or the civil commitment procedure, we should explain (without deciding) the argument why § 24–301(d) is not punitive—why, under § 24–301(d) the criminal offense does not provide a basis for confinement. Once it is clear that § 24–301(d) and § 21–545(b) arguably establish equally valid procedures for determining mental illness and dangerousness, it should then be clear why appellant's request here—release or civil commitment at the end of the maximum potential prison term—is inconsistent with the presumed validity of his confinement.

Arguably, the acknowledged differences between the two procedures—most notably the right to jury trial and allocation of the burden of proof to the government under the civil commitment scheme—can be justified by reference to situational differences between the two groups immediately prior to the respective hearings. The civil commitment question, as to any potential committee, is of first impression, whereas the "release hearing" procedure for an acquitee presumably can be somewhat abbreviated

because of the predictive value of the initial determinations of insanity and dangerousness at the criminal trial. (That predictive value rests on the defendant's own prior proof of his insanity by a preponderance of the evidence—by a jury trial if he requested it.) Whereas the § 24–545(b) hearing, therefore, represents a de novo process, the § 24–301(d) hearing is an updating process to determine how present mental status compares with earlier findings which had been urged by the defendant himself. *See* note 7 *supra.* In either case, the only concern is a determination as to sanity and dangerousness, with a view to rehabilitation. Given these situational differences between acquitees and potential commitees immediately prior to the initial commitment determination, the difference in hearing procedures is arguably justified; there is no constitutional prohibition against rational differences in the treatment of differently situated persons.

There is accordingly, no room for appellant's contention that his hospital confinement must cease (subject to civil commitment) at the end of the maximum term for which he could have been confined to prison. Although the confinement procedures differ for acquitees and commitees, the status of each group after confinement is the same: each has been found mentally ill and dangerous, and each, as a result, has been confined for the protection of self or society, as well as for treatment, not punishment.[9] The termination of the maximum sentence period is thus irrelevant to the status of acquitees; that termination does not alter the similarity of situation between acquitees (after confinement) and commitees.

In summary, the length of a hypothetical potential prison term has no relationship to the rehabilitative goal of hospital confinement. If, as the presumed validity of appellant's initial commitment implies, the differences in hearing procedures for acquit-

---

id finding of mental illness and dangerousness than the civil commitment process would yield.

9. Appellant has not argued that his physical or other treatment at St. Elizabeths, as an acquitee, differs in a legally significant way from that accorded to commitees.

ees and committees are justified because, prior to hearing, they are differently situated, there is no rational, let alone constitutional, basis for arguing that an abrupt change of procedure is required simply because somewhere along the line the hypothetical maximum sentence has ended. The proper context for analysis is rehabilitating the patient, not ending a penal sentence.

## IV.

■ There is, however, a final point to be made. In holding that the principles of *Baxstrom, supra, Bolton, supra,* and *Waite, supra,* do not require release (or civil commitment) of a person if validly committed pursuant to a § 24–301(d) release hearing, we feel bound to make clear that this decision does not affect the continuing validity of *Bolton, supra* with respect to post-commitment acquitees. As noted earlier, the chapter 24 criminal commitment scheme for acquitees does not mandate the regular six-month review, initiated by the hospital, afforded to civil commitees by § 21–548. Chapter 24 only provides for review at the hospital's initiative, § 24–301(e), upon the acquitee's motion for relief, § 24–301(k), or upon petition for habeas corpus, § 24–301(g). Because post-commitment acquitees and commitees are similarly situated, we conclude that, as a matter of constitutional equal protection, acquitees are entitled to periodic review similar to that afforded to civil commitees. *See Bolton, supra.* Accordingly, we hold that D.C.Code 1973, § 21–548, shall be deemed applicable to hospitalized acquitees at least to the extent required by *Bolton, supra. See* note 2 *supra.*[10]

## V.

Appellee's motion for summary affirmance is granted. Appellant's motion for summary reversal is denied. As a result, appellant Jones' commitment order is sustained, subject to his right to periodic review in accordance with this opinion.

*So ordered.*

10. We feel constrained by *M. A. P. v. Ryan,* D.C.App., 285 A.2d 310 (1971) both to acknowledge—and not go beyond—the holding in *Bolton, supra* on this point.

MACK, Associate Judge:

I read the majority opinion as holding that the right to release of a person acquitted of a crime, but confined because of mental illness, cannot turn upon the length of a sentence that the person might have received had he been convicted. I do not read the opinion as suggesting that the procedures outlined in D.C.Code 1973, § 24–301 would pass muster as against a challenge on equal protection or procedural due process grounds. *See Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). For these reasons I concur.