**Michael A. JONES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11918.**

District of Columbia Court of Appeals.

Argued En Banc Sept. 8, 1980.

Decided May 29, 1981.

Silas J. Wasserstrom, Public Defender Service, Washington, D. C., for appellant.

Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Oscar Altshuler, Asst. U. S. Attys., Washington, D. C., were on the petition, for appellee.

Larry Martin Corcoran, Washington, D. C., filed a brief as amicus curiae.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER,* NEBEKER, HARRIS, MACK, FERREN and PRYOR, Associate Judges.

KELLY, Associate Judge:

Appellant Michael A. Jones is a mental patient at St. Elizabeths Hospital where he has been committed since March 1976, pursuant to D.C.Code 1973, § 24–301(d).[1] In February 1977, he appealed from an order by Judge Eugene N. Hamilton denying his request for immediate release from St. Elizabeths or in the alternative for civil commitment in accordance with the procedures set forth in D.C.Code 1973, § 21–545(b),[2] basing his challenge to his continued confinement on the argument that detention beyond the maximum period for which he could have been imprisoned for the offense of which he was acquitted denies him equal protection of the laws.

Our first panel opinion, which relied on an express abstention from a challenge to his initial commitment, held that appellant had no right to the relief requested. *Jones v. United States*, D.C.App., 396 A.2d 183 (1978). Appellant petitioned for rehearing or rehearing en banc, objecting to the panel's decision as unfairly based on his abstention from a challenge to the initial commitment under D.C.Code 1973, § 24–301(d)(2). Rehearing was thereafter granted and a second opinion issued holding that appellant was entitled to immediate release unless the government civilly committed him pursuant to D.C.Code 1973, § 21–545(b) because the "release hearing procedure is to some extent 'punitive' " and it would be a denial of equal protection to confine appellant under criminal commitment procedures beyond his hypothetical maximum prison sentence. *Jones v. United States*, D.C.App., 411 A.2d 624 (1980). The government petitioned for rehearing en banc, disputing the determina-

---

* Judge Gallagher was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 27, 1981.

1. Subsection 24–301(d), which controls the commitment of persons found not guilty by reason of insanity (acquittees), reads:

 (d)(1) If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e).

 (2) A person confined pursuant to paragraph (1) shall have a hearing, unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody. At the conclusion of the criminal action referred to in paragraph (1) of this subsection, the court shall provide such person with representation by counsel—

 (A) in the case of a person who is eligible to have counsel appointed by the court, by continuing any appointment of counsel made to represent such person in the prior criminal action or by appointing new counsel; or

 (B) in the case of a person who is not eligible to have counsel appointed by the court, by assuring representation by retained counsel.

 If the hearing is not waived, the court shall cause notice of the hearing to be served upon the person, his counsel, and the prosecuting attorney and hold the hearing. Within ten days from the date the hearing was begun, the court shall determine the issues and make findings of fact and conclusions of law with respect thereto. The person confined shall have the burden of proof. If the court finds by a preponderance of the evidence that the person confined is entitled to his release from custody, either conditional or unconditional, the court shall enter such order as may appear appropriate.

 (3) An appeal may be taken from an order entered under paragraph (2) to the court having jurisdiction to review final judgments of the court entering the order.

2. Subsection 21–545(b), concerning involuntary civil commitment, reads, in pertinent part:

 If the court or jury finds that the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty, the court may order his hospitalization for an indeterminate period, or order any other alternative course of treatment which the court believes will be in the best interests of the person or of the public. The Commission, or a member thereof, shall be competent and compellable witnesses at a hearing or jury trial held pursuant to this chapter. The jury to be used in any case where a jury trial is demanded under this chapter shall be impaneled, upon order of the court, from the jurors in attendance upon other branches of the court, who shall perform the services in addition to and as part of their duties in the court.

tion that the District of Columbia commitment scheme for insane criminals is punitive. Its petition was granted and the case was reheard by the en banc court. Since our previous opinions were vacated, we consider anew appellant's equal protection claim and hold that he is not entitled to automatic release from St. Elizabeths upon the expiration of his hypothetical maximum prison sentence unless civil commitment proceedings are instituted by the government.

Appellant's commitment resulted from a September 1975, charge of attempted petit larceny. He was first admitted to St. Elizabeths because of a court-ordered competency examination.[3] On March 12, 1976, on stipulated facts as to the crime and as to insanity, appellant was acquitted by the court of the charge by reason of insanity. On May 25, 1976, Judge James A. Washington held a "50-day release hearing" pursuant to D.C.Code 1973, § 24–301(d)(2)[4] and continued appellant's confinement at St. Elizabeths because of his failure to prove by a preponderance of the evidence that he. was no longer mentally ill or dangerous to himself and others.[5] A further hearing was set for November 29, 1976. On that date, Judge Hamilton held a second hearing during which appellant raised the argument that his confinement under § 301(d) could not extend beyond his hypothetical maximum prison sentence and that he was therefore entitled to release. The court ordered the government to show cause why appellant should not be released or civilly committed under D.C.Code 1973, § 21–545(b). After a hearing in February of

1977, Judge Hamilton denied appellant's motion for immediate release or, in the alternative, civil commitment, and continued his indefinite confinement at St. Elizabeths. A timely appeal from this order was filed on February 28, 1977.[6]

Before analyzing appellant's equal protection claim, we deem it necessary to reject any suggestion that confinement pursuant to subsection 301(d) is punitive in nature. We recognize that appellant never explicitly made such an assertion, but that implication underlies his argument (and certainly our prior opinions) that the length of the prison sentence which an acquittee might have received determines when he is entitled to release or civil commitment under Title 24 of the D.C.Code. We conclude that there is no basis for finding § 301(d) punitive in any respect.

This court's decision in *Bethea v. United States*, D.C.App., 365 A.2d 64, 90 (1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977), noted that "Congress struck a careful balance between the interest of the individual and those of the community," in the enactment of the District of Columbia commitment scheme for persons acquitted by reason of insanity. The purpose behind this careful balance was explained in *Hough v. United States*, 106 U.S. App.D.C. 192, 195, 271 F.2d 458, 461 (1959), when Judge Bazelon stated that

> [T]he basic policy underlying the statute ... as we read the legislative history, is to provide treatment and cure for the individual in a manner which affords reasonable assurance for the public safety. . . .

---

**3.** *See* D.C.Code 1973, § 24–301(a). The psychologist's report stated that appellant was competent to stand trial, but that he had "signs and symptoms of a sever mental disorder, including auditory hallucinations" and that he should be hospitalized at St. Elizabeths for treatment.

**4.** *See* note 1 *supra.*

**5.** In an April 23, 1976 letter, the Superintendent of St. Elizabeths reported that Jones was suffering from schizophrenia, paranoid type, and was on medication. The letter also stated that "Mr. Jones is in need of further hospitalization,

and by virtue of his mental illness, he would be a danger to himself and to others if released into the community at this time."

**6.** A subsequent motion for unconditional release under § 301(k) was denied in March of 1977. Three months later, however, appellant was granted conditional release on terms recommended by St. Elizabeths' staff, allowing daytime and overnight visits into the community. He was also admitted into the civil division of the hospital, though as a result of disruptive behavior, he was retransferred to the forensic division.

More recent cases reiterate the dual purpose of § 301(d) as first, the treatment and recovery of the patient, and second, the protection of society and the patient. *Collins v. Cameron*, 126 U.S.App.D.C. 306, 308, 377 F.2d 945, 947 (1967); *Overholser v. O'Beirne*, 112 U.S.App.D.C. 267, 269, 302 F.2d 852, 854 (1961); *Ragsdale v. Overholser*, 108 U.S.App.D.C. 308, 312, 281 F.2d 943, 947 (1960). The 1970 amendments to § 301(d), enacted in response to the decision in *Bolton v. Harris*, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968),[7] have not altered its original purpose. *See United States v. Jackson*, 179 U.S.App.D.C. 375, 381, 553 F.2d 109, 115 (1976). Indeed, the *Bolton* decision inescapably leads to the conclusion of nonpunitiveness. This is because *Bolton's* requirement of a separate judicial hearing before indeterminate commitment was intended to undo the punitive aspects attending the formerly automatic connection between the determination of guilt and the commitment of a defendant who pleaded insanity.

■ The exclusively remedial and protective goals of the statute demonstrate that a punitive rationale has no part in the commitment of persons acquitted by reason of insanity. We agree that

> [i]n the light of [the legislative] purpose [of § 301], we must reject the District Court's suggestion that appellant is a "prisoner." Nothing in the history of the statute—and nothing in its language—indicates that an individual committed to a mental hospital after acquittal of a crime by reason of insanity is other than a patient. The individual is confined in the hospital for the purpose of treatment not punishment; and the length of confinement is governed solely by considerations of his condition and the public safety. Any preoccupation by the District Court with the need of punishment for crime is out of place in dealing with an individual

who has been acquitted of the crime charged. [*Hough v. United States, supra* at 196, 271 F.2d at 462.]

Society may not excuse a defendant's criminal behavior because of his insanity and at the same time punish him for invoking an insanity defense. This would nullify that defense, contrary to express legislative intent, *see* D.C.Code 1973, § 24–301(j) (establishing procedures for pleading insanity), and raise serious constitutional issues.

The regulatory nature of § 301(d) is also evidenced by the non-adversarial character of commitment decisions. All parties, including the government, the hospital[8] and the acquittee assist in presenting the facts relevant to a determination of the proper conditions and treatment for the insanity acquittee. *See United States v. Ecker*, 177 U.S.App.D.C. 31, 45, 543 F.2d 178, 192 (1976), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977); *Bolton v. Harris, supra* at 12 n.64, 395 F.2d at 563 n.64; *Lake v. Cameron*, 124 U.S.App.D.C. 264, 268, 364 F.2d 657, 661 (1966) (en banc).

■ Furthermore, plain reason compels rejection of appellant's reliance on his hypothetical maximum prison term as artificial and meaningless. Statutory maximum sentences have no relationship to the purposes of mental care and treatment. They are intended rather, to set the outer boundaries of lawful punishment for persons found criminally responsible for specified offenses. Not even convicted criminals are automatically sentenced to the maximum applicable term of incarceration. Subsection 301(d) commitments are neither expressly nor impliedly related to statutory maximum sentences. To the contrary, § 301(d) contemplates an indeterminate period of confinement and treatment, depending on when the patient has recovered his sanity or no

---

7. *Bolton* held that acquittees are entitled to a hearing "substantially similar" to the hearings afforded civil committees before they are indeterminately confined. The implications of this holding are more fully discussed below.

8. In *Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 330, 427 F.2d 589, 600 (1970), the circuit court

in reversing the dismissal of an insanity acquittee's habeas corpus petition, stated that "Saint Elizabeths bears a special responsibility for assuring that information regarding the patient's condition is fully presented to the District Court, and that the court understandingly considers the information presented."

longer poses a danger to himself or others.[9] As *Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 325, 427 F.2d 589, 595 (1970) explains:

> Confinement of the mentally ill rests upon a basis substantially different from that which supports confinement of those convicted of crime. In the latter case, with rare exceptions, the continuing validity of confinement rests solely on the validity of the initial commitment. Confinement of the mentally ill, however, depends not only upon the validity of the initial commitment but also upon the continuing status of the patient. Specifically, under our statutes, he must be released from the hospital if he is no longer mentally ill; if, although he remains mentally ill, he is no longer "likely to injure himself or other persons"; or, should the patient so desire, if a course of outpatient treatment can be fashioned that will adequately protect the interests both of the patient and the public. [Footnotes omitted.]

The notion that the duration of an acquittee's hospitalization can be established by statute or court order ignores the most basic precepts of medicine and psychiatry. Unfortunately, the present state of the art makes it generally impossible to predict either the time required to rehabilitate a mental patient, if at all possible, or at what point he will cease to be a danger to himself or others. Only ongoing medical and psychiatric evaluation offer a realistic hope of such prognosis.[10] Therefore, reference to either a hypothetical maximum prison sentence, or even to a judicially limited commitment term would completely refute the statutory purpose of § 301(d) and would frustrate any attempt at treating and rehabilitating mental patients who happen to have been acquitted of crimes by reason on insanity.

Our conclusion that § 301(d) is not punitive is supported by our recent decision in *United States v. Edwards*, D.C.App., 430 A.2d 1321 (Nos. 80–294 & 80–401, May 8, 1981) (en banc), where the contention that incarceration inevitably constitutes punishment was rejected. Though commitment of acquittees is in no sense incarceration, the principle that the penal character of a statute depends on its underlying nature and whether it is reasonably supported by a legitimate state interest, applies equally to the analysis of commitment statutes.[11]

---

9. Thus it would be more accurate to say, and certainly more analytically useful, that appellant is actually challenging the indeterminate length of his commitment at St. Elizabeths, rather than only his "continued" confinement there. Equal protection, if violated at all, would be just as well put into question at the inception of the commitment since it effectively means an indefinite period of confinement.

10. *See Addington v. Texas*, 441 U.S. 418, 430–31, 99 S.Ct. 1804, 1811–12, 60 L.Ed.2d 323 (1979), and authorities cited therein, holding that the lack of certainty and the fallibility of psychiatric diagnosis make proof of insanity by clear and convincing evidence constitutionally sufficient. *Addington* also recognized that "[i]n a civil commitment state power is not exercised in a punitive sense." *Id.* at 428, 99 S.Ct. at 1811. While Chief Justice Burger's opinion did not deal with commitment of persons found not guilty by reason of insanity, a § 301(d) commitment is actually a civil, not a criminal proceeding and *Addington's* reasoning should apply with equal force to commitment of acquittees.

11. *See Bell v. Wolfish*, 441 U.S. 520, 537–38, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). Factors relevant to the determination of whether a statute is punitive are:

> "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions." [*Id.* at 537–38, 99 S.Ct. at 1873 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963)).]

The *Bell* case also noted that

> A court must decide whether the disability is imposed for the *purpose* of punishment or whether it is but an incident of some other legitimate government *purpose* .... Absent a showing of an expressed *intent* to punish on the part of detention facility officials, that determination generally will turn on "wheth-er an alternative purpose to which [the re-

There is no evidence that the District of Columbia statutory scheme for commitment of insane criminals is anything but a regulatory, prophylactic statute, based on a legitimate governmental interest in protecting society and rehabilitating mental patients. Nor is § 301(d) rendered penal by the fact that it is predicated on the commission of a crime. Evidence of crime is only one of the elements triggering § 301(d) commitment, the other element being proof of insanity by a preponderance of the evidence. Since the crime is relevant only insofar as it indicates dangerousness, not evil or criminal responsibility, the presumption of continuing dangerousness, which is rebuttable by the acquittee, is both reasonable and valid.

■ Because we have no evidence in the record that the conditions of appellant's confinement are punitive or that his particular commitment was based on punitive considerations, we must conclude that appellant's detention is grounded on the legitimate nonpunitive interests of the District of Columbia.

■ Appellant challenges his confinement under § 301(d) as violative of equal protection of the laws. The due process guarantee of the Fifth Amendment of the United States Constitution, which is directly applicable to the District of Columbia, encompasses the right to equal protection. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Matter of C.W.M.,* D.C.App., 407 A.2d 617, 625 (1979).

In the absence of specific objections to conditions of confinement or claims of inadequate or discriminatory treatment,[12] the validity of appellant's equal protection claim depends on whether the differences between the present § 301(d) commitment scheme and the involuntary committment scheme under § 545(b) of Title 21 are justifiable by reason of the situational differences between acquittees and committees.

Our analysis begins with the Supreme Court case of *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), which held that equal protection requires that a prisoner to be transferred to a mental hospital be given the same procedural protections as those afforded other persons subject to involuntary civil commitment. Two years later, the United States Court of Appeals for the District of Columbia found that *Baxstrom's* equal protection holding, as well as the due process guarantees of *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967),[13] require that "persons found not guilty by reason of insanity . . . be given a judicial hearing with procedures substantially similar to those in civil commitment proceedings." *Bolton v. Harris, supra* at 10, 395 F.2d at 651 (footnote omitted). *Bolton* was expressly premised on the weakness of the proof of a defendant's insanity at the time of the offense; when *Bolton* was decided, the standard for acquittal was whether there was a reasonable doubt regarding past sanity. *Id.* at 8, 395 F.2d at 649. The 1970 amendments to § 301 have significantly narrowed this evidentiary gap by requiring that the defendant affirmatively prove his exculpating insanity to the jury by a preponderance of the evidence at the trial for his criminal offense. D.C.Code 1973, § 24–301(j).[14] The

striction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." [*Id.* at 538, 99 S.Ct. at 1873 (quoting *Kennedy v. Mendoza-Martinez, supra* at 168–69, 83 S.Ct. at 567–68 and citing *Flemming v. Nestor,* 363 U.S. 603, 613–17, 80 S.Ct. 1367, 1373–76, 4 L.Ed.2d 1435 (1960)) (emphasis added).]

12. The right to treatment for mental illness is recognized in *Tribby v. Cameron,* 126 U.S.App. D.C. 327, 379 F.2d 104 (1967), and *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1966).

13. *Specht* held that sentencing pursuant to Colorado's Sex Offenders Act was criminal punishment and violated due process because it made a conviction for a sex offense the basis of indeterminate sentencing without affording the defendant a hearing on the issue of his mental illness, dangerousness or recidivism.

14. Subsection 301(j)'s shift in the burden of proof was upheld against constitutional attack in *Bethea, supra,* and *United States v. Greene,* 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974).

judicial hearing required by *Bolton* was codified in § 301(d)'s 50-day release hearing provision, notwithstanding the changed nature of the insanity defense.

The equal protection test suggested by these cases is that the procedures and standards of different commitment schemes be relevant to the classification and that any differences not be substantial. We therefore agree with the statement in *United States v. Jackson, supra* at 386, 553 F.2d at 120, that § 301(d) "must be upheld if there is a rational basis for the scheme it creates." The court arrived at this conclusion by determining that neither *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (indeterminate pretrial commitment procedures found to violate equal protection), nor *Baxstrom, supra*, held that strict scrutiny applies to procedures used for the criminal commitment of mentally ill persons.[15] In reviewing the petitioner's argument in *Baxstrom*, Chief Justice Warren stated that "[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which classification is made." *Baxstrom, supra*, 383 U.S. at 111, 86 S.Ct. at 762. *Bolton* also recognized that "a reasonable application [of the equal protection doctrine] permits Subsection (d) to treat persons acquitted by reason of insanity differently from civilly committed persons to the extent that there are relevant differences between those two groups." *Bolton, supra* at 10, 395 F.2d at 651. But substantial differences are prohibited under *Bolton*. *Id.* Thus, a reasonable distinction between the two statutory schemes would be one that is both relevant to the government's legitimate interests in the separate classification and not impermissibly substantial.

 Before reviewing the differences between § 24–301(d) and § 21–545(b), it is important to note their similarities. First, the substantive standard of commitment is identical under both statutes. The twofold proof requirement of mental illness and dangerousness varies only in the manner in which it is established.[16] Second, both § 24–301(d)(2) and § 21–545(b) provide for mandatory judicial hearings, with notice and assistance of counsel (court-appointed if necessary). These common characteristics constitute the essential due process rights associated with involuntary commitment. *See Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (recognizing a prisoner's due process rights to a hearing before transfer to a mental health facility);[17] *Specht v. Patterson, supra*.[18] Thus

---

**15.** *See also State v. Krol*, 68 N.J. 236, 252, 344 A.2d 289, 298 (1975) (questioning the equal protection test applicable to differences in commitment schemes required by *Baxstrom, supra*, and *Jackson v. Indiana, supra*) and Novak, *Realigning the Standards of Review Under the Equal Protection Guarantees—Prohibited, Neutral and Permissive Classifications*, 62 Geo. L.Rev. 1071, 1101–03 (1974) (suggesting that *Jackson v. Indiana, supra*, and *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), were based on a "demonstrable rational basis" test).

**16.** The two-prong test is explicitly stated in § 21–545(b); however, § 24–301(d) refers only to an acquittee's entitlement to release. But it is reasonable to assume that the same standard governs § 301(d) release hearings by reference to § 24–301(e), which states that entitlement to release, upon hospital certification, depends on a showing that the acquittee is no longer mentally ill and dangerous.

**17.** Justice White approvingly listed the following procedures outlined by the Nebraska District Court as the minimum required before transfer of a prisoner to a mental hospital:

"A. Written notice to the prisoner that a transfer to a mental hospital is being considered;

B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;

C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;

D. An independent decisionmaker;

E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

with respect to important constitutional protections the two statutes provide the same coverage.

As persuasively explained in our first panel opinion, the differences between the two procedures

> can be justified by reference to situational differences between the two groups immediately prior to the respective hearings. The civil commitment question, as to any potential committee, is of first impression, whereas the "release hearing" procedure for an acquittee presumably can be somewhat abbreviated because of the predictive value of the initial determinations of insanity and dangerousness at the criminal trial. (That predictive value rests on the defendant's own prior proof of his insanity by a preponderance of the evidence—by a jury trial if he requested it.) Whereas the § 24–545(b) hearing, therefore, represents a de novo process, the § 24–301(d) hearing is an updating process to determine how present mental status compares with earlier findings which had been urged by the defendant himself.... In either case, the only concern is a determination as to sanity and dangerousness, with a view to rehabilitation. Given these situational differences between acquittees and potential committees immediately prior to the initial commitment determination, the difference in hearing procedures is arguably justified; there is no constitutional prohibition against rational differences in the treatment of differently situated persons. [*Jones v. United States, supra,* 396 A.2d at 189.]

There appear to be three differences between § 24–301(d) and § 21–545(b) commitments: (1) the availability of jury trial, (2) the question of who carries the burden of proof, and (3) the amount of proof required to justify commitment.[19] We review these distinctions individually to ascertain whether they are permissibly relevant or impermissibly substantial under *Baxstrom* and *Bolton.*

■ While the jury trial right available to committees is not similarly available to an acquittee in a 50-day release hearing, this difference is justified by the fact that the acquittee has had a right to a jury determination of his sanity at the time of the offense.[20] Thus the acquittee's mental illness is initially established by affirmative proof. Dangerousness is no less validly established by proof that the defendant committed the criminal act, a finding necessarily underlying any acquittal by reason of insanity. *See Bethea, supra* at 93–95; *Smothers v. United States,* D.C.App., 403 A.2d 306, 310 (1979). In *United States v. Ecker, supra* at 48, 543 F.2d at 195, the court stated that "[s]ince 1958 this court has consistently accepted the proposition that the dangerousness demonstrated by the commission of a crime and acquittal by reason of insanity constitutes a rational basis for the disparity in release provisions governing acquittees and committees." (Footnote omitted). *Ecker* also recognized that some disparities in commitment proceedings are similarly permissible, *id.* at 49–50, 543 F.2d at 196–97, and explained that "[s]ubsection (d) patients are treated differently from civil committees because they are 'an exceptional class of people' who

---

18. The *Specht* opinion held that

> Due process ... requires that [the defendant] be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-

F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own; and
G. Effective and timely notice of all the foregoing rights." [*Vitek v. Jones, supra* at 494–95, 100 S.Ct. at 1264.]

> examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed. [*Id.* 386 U.S. at 610, 87 S.Ct. at 1212.]

19. We do not compare the differences in post-commitment procedures since they are not covered in these subsections and appellant's claim is based on the alleged invalidity of his confinement under subsection 301(d).

20. Appellant's waiver of the right to a jury at his criminal trial does not affect our argument.

have 'already unhappily manifested the reality of anti-social conduct.'" *Id.* at 50, 543 F.2d at 197 (footnotes omitted).

The fact that appellant's mental illness and dangerousness are not jury determined, but derived from a prior jury finding, is not significant since the continuation of these attributes is a rational and permissible evidentiary presumption.[21] In *Waite v. Jacobs*, 154 U.S.App.D.C. 281, 288–89, 475 F.2d 392, 399–400 (1973), the validity of this presumption was recognized:

> The rational justification for placing the burden of proof on a committee is that his mental illness and dangerousness have previously been convincingly established. In light of those established facts, the law gives effect to a presumption of continuity of status. It comports with normal perceptions of reality—and hence is rational—to assume that, once a given status is proven to exist, it continues to do so in the absence of evidence showing the contrary to be more likely than not.

In *Waite*, however, the presumption was not applicable because unlike in the instant case, the appellant had never been afforded a post-acquittal judicial hearing on the question of his continued mental illness and dangerousness.

The availability of a jury trial under § 21–545(b) and the absence of such a right at a § 24–301(d) hearing is also an insubstantial difference because the findings of mental illness and dangerousness are based on expert testimony and are not matters uniquely within the province of a jury of lay persons. In *Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979), the Court explained that in contrast to delinquency proceedings or criminal prosecutions where "the basic issue is a straightforward factual question—did the accused commit the act alleged," the factual questions in a civil commitment proceeding "represent only the beginning of the inquiry." The Court continued: "Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Id.* (emphasis in original). Thus, both judge and juror are forced to rely on expert evidence in commitment proceedings, significantly diminishing the importance of their personal judgment, values and experience. In sum, because (1) an acquittee has a right to a jury determination of past insanity at his criminal trial; (2) it is reasonable to presume the continuation of a mental illness; and (3) a jury right in commitment proceedings is not as meaningful as it is in ordinary criminal cases, the absence of a jury right at a § 24–301(d) release hearing is not a substantial difference vis-a-vis § 21–545(b) civil commitment.

The second distinction between the two commitment procedures in the District of Columbia is the fact that the government bears the burden of proof in a § 21–545(b) hearing, whereas in the 50-day release hearing, the acquittee must prove that he is no longer mentally ill or dangerous. It is entirely rational for the District to require an acquittee to prove his entitlement to release where he was the one to advocate the fact of his past insanity. Automatic § 301(d) commitment does not follow an acquittal by reason of insanity when the question of insanity is raised by the court or the prosecutor, rather than the defendant. *United States v. Wright*, 167 U.S.App.D.C. 309, 511 F.2d 1311 (1975). As mentioned above, the presumption that a mental condition continues is a reasonable one and it is also reasonable to require the person who raised the presumption to refute it by affirmative proof. Furthermore, whatever difference in risk allocation there might be between

---

21. It is also noteworthy that the Criminal Jury Instruction for the District of Columbia, No. 5.11 (3d ed. 1978), to be given when a defense of insanity is pleaded, informs the jury that the consequence of an acquittal by reason of insanity will be automatic commitment of the defendant to St. Elizabeths, followed by a release hearing within 50 days. The jury is also instructed that at this hearing the defendant must prove to the court, by a preponderance of the evidence, that he is entitled to release. This instruction was approved in *United States v. Brawner*, 153 U.S.App.D.C. 1, 29–30, 471 F.2d 969, 997–98 (1972).

the two statutes as a result of who bears the burden of proof is minimized by the fact that when the acquittee bears the burden, he need prove entitlement to release by only a preponderance of the evidence, the lowest standard of proof, whereas when the government bears the burden, it must prove insanity and dangerousness by a higher standard, namely that of clear and convincing evidence. *In re Nelson*, D.C.App., 408 A.2d 1233 (1979).

Yet this disparity in the level of proof by which mental illness and dangerousness are established under the two procedures, when not regarded as a counterbalance to the risk of non-persuasion, is another difference between § 24–301(d) and § 21–545(b) which must be justified as rationally related to the situational differences between acquittees and committees. An acquittee's past insanity is proven by a preponderance of the evidence. His present insanity is determined by his failure to rebut, by a preponderance of the evidence, the presumption of continuing insanity. In contrast, a committee's detention is based on clear and convincing evidence of mental illness and dangerousness. *In re Nelson, supra.*[22] The difference between these two standards is justified by the fact that Congress determined that a defendant raising an insanity defense should not have to meet a higher burden on such a relatively difficult issue. However, when the District seeks to commit a person who is disputing the fact of insanity or dangerousness, it is reasonable that the risk of error be more heavily thrust upon the government. *See Addington v. Texas, supra.*

In *Bolton, supra* at 10 n.50, 395 F.2d at 651 n.50, and in *United States v. Brown*, 155 U.S.App.D.C. 402, 478 F.2d 606 (1973), the circuit court also recognized that a preponderance standard is enough to provide equal protection to acquittees.

Appellant has argued that a series of later Supreme Court and circuit court decisions based on an equal protection theory support his entitlement to release as of the expiration of his hypothetical maximum prison term. However, the cases cited by appellant are all distinguishable.

In *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), a defendant convicted of contributing to the delinquency of a minor was committed to a "sex deviate facility" in a Wisconsin state prison in lieu of sentence. The statute authorizing such commitment provided an initial term equal to the maximum sentence the defendant could have received, and five-year renewals based on a judge-made finding of dangerousness. The statutory scheme in *Humphrey* clearly included an express punitive element evidenced by the limitation of the initial commitment term to a period corresponding to that applicable to those convicted.[23]

In the same term that it decided *Humphrey*, the Supreme Court held that indefinite confinement of a person charged with a crime and found incompetent to stand trial violated equal protection because the criminal charges were insufficient to prove either that the defendant was dangerous or that he required treatment. *Jackson v. Indiana, supra. Jackson* is inapposite to the instant case because Jackson was never tried for the crime with which he was charged. *See United States v. Ecker, supra* at 49–51, 543 F.2d at 196–98 (distinguishing *Jackson* for same reason in equal protection challenge to § 24–301(e)). Since his contin-

---

22. Since appellant has not challenged his initial commitment, we view his argument as based on a present denial of equal protection. We note, however, that in May 1976, when appellant received his 50-day release hearing, the prevailing standard was proof beyond a reasonable doubt, *In re Hodges*, D.C.App., 325 A.2d 605 (1974) (overruled in *In re Nelson, supra* ). The greater disparity in proof between the two commitment standards that existed when appellant was first committed would not alter our conclusion that the difference in the level of proof required is both rational and not so substantial as to violate equal protection.

23. We disagree with the interpretation of *Humphrey* in *Waite v. Jacobs, supra* at 287, 475 F.2d at 398, that there is little difference between the position of an acquittee and that of a convicted defendant subject to the Wisconsin statute, since we have determined that there is no punitive element to § 301(d) commitments.

ued detention was not based on any other evidentiary predicate of dangerousness, it therefore became invalid after "the reasonable period of time necessary to determine whether there is a substantial probability that [the person held] will attain [the] capacity [to stand trial] in the foreseeable future." *Id.* 406 U.S. at 738, 92 S.Ct. at 1858.

Appellant's reliance on the District of Columbia Circuit cases of *Waite v. Jacobs, supra,* and *United States v. Brown, supra,* is also unavailing.[24] Waite was acquitted before the *Bolton* decision and therefore automatically committed after a finding of not guilty by reason of insanity without a judicial hearing on his continued mental illness and dangerousness, which was subsequently required by *Bolton* and codified in § 24–301(d)(2). Waite's commitment was therefore invalid from the beginning and arguably justifiable only as penal detention. As such, it was limited to the applicable maximum sentence period.

 Brown was a "post-*Bolton,* pre-1970 amendments" acquittee who challenged the burden of proof at his post-acquittal judicial hearing. The Court of Appeals in *Brown* upheld the preponderance standard applied, justifying the difference in the level of proof vis-à-vis the level of proof required in § 21–545(b) proceedings by the "meaningful elements of responsibility" which an acquittee may have. Insofar as this reasoning suggests a punitive element to § 301(d) we reject it as inconsistent with our finding that the commitment scheme for acquittees is not intended to attribute any guilt or imply any social indebtedness in the excuse of a criminal offense. Therefore, we need not follow the dicta in *Brown* that "[t]he extent of [the commitment] period [justified by a post-*Bolton,* pre-1970 amendments commitment] calls for sound discretion, would take into account, *e. g.,* the nature of the crime (violent or not), nature of treatment given and response of the person, would generally not

exceed five years, and should, of course, never exceed the maximum sentence for the offense, less mandatory release time." *Id.* at 408, 478 F.2d at 612. As previously explained, the only factors relevant to release from a mental institution are the acquittee's continued dangerousness and his need for treatment. Judicial limitations on the duration of confinement based on hypothetical prison terms or other arbitrary determinations of a maximum term of hospitalization, as suggested in *Brown,* have no relation to the purpose of the statute. In any event, the need for such limitations has been obviated by the enactment of the 1970 amendments to § 24–301.

For the foregoing reasons, the trial court's order denying appellant's right to immediate release or, in the alternative, civil commitment pursuant to D.C.Code 1973, § 21–545(b) is

*Affirmed.*

FERREN, Associate Judge, with whom NEWMAN, Chief Judge, and MACK, Associate Judge, join, dissenting:

I continue to subscribe to our division opinion on rehearing, 411 A.2d 624 (1980), *vacating* 396 A.2d 183 (1978).

## I.

Under the civil commitment process, D.C. Code 1973, §§ 21–541 to –545, the government has the burden of proving a person is mentally ill and dangerous to self or others—and proving it to a jury if the potential committee so demands. *Id.* § 21–544. In contrast, under the "insane criminal" commitment process, D.C.Code 1973, §§ 24–301 to –303, a defendant acquitted by reason of insanity has the burden of proving he or she no longer is mentally ill or dangerous—without the right to a jury. *Id.* § 24–301(d)(2).

Our colleagues in the majority conclude that these differences in treatment of two classes of institutionalized persons—com-

---

**24.** These cases are not formally binding on this court because they were decided after February 1, 1971, the effective date of the District of Columbia Court Reform and Criminal Procedure Act of 1970. *M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

mittees and acquittees—do not violate the acquittee's constitutional right to equal protection of the laws. In response to the allegation that the procedural shortcuts in § 24–301 reflect a punitive purpose, in contrast with a wholly therapeutic purpose underlying the civil commitment process, the majority concludes "that there is no basis for finding § 301(d) punitive in any respect." *Ante* at 368.[1]

I do not understand the majority to disagree with the proposition that *if* § 24–301(d) imposes punishment in any respect, the analysis in our division opinion is constitutionally sound.[2] It would follow that, "because the maximum possible prison term for which appellant Michael Jones could have been incarcerated has expired, he is entitled to release from St. Elizabeths Hos-

pital, subject to the government's right to seek civil commitment." 411 A.2d at 630.

I therefore propose to discuss in greater detail the determinative issue: whether § 24–301(d) is, to some extent, punitive.

## II.

The Supreme Court has identified several factors for use in determining whether a statute is punitive. A court first should look for "objective manifestations of congressional purpose." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169, 83 S.Ct. 554, 568, 9 L.Ed.2d 644 (1963). *Accord, Bell v. Wolfish*, 441 U.S. 520, 538, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). Where it is not clear on the face of the statute whether Congress had a punitive intent, a court must consider a variety of other factors:

---

1. The majority maintains that the lesser protections in § 24–301—burden of proof on the acquittee, without right to jury trial—do not alter its equivalence to §§ 21–544 and –545, for the acquittee already has had a right to jury trial on the conduct manifesting insanity, and the shift in burden of proof is justified by a valid evidentiary presumption that the acquittee's insanity at the time of the offense—which he himself asserted—continues to the time of the release hearing. That hearing, therefore, unlike a civil commitment proceeding, is a procedure to update, not initiate, the inquiry.

 In our division opinion on rehearing we rejected that analysis. We noted that the presumption of continuing insanity is questionable, spanning as it does months or even years between the time of the offense and the time of the release hearing. Furthermore, we saw that the courts analyzing criminal and civil commitment schemes in other jurisdictions "typically mix evidentiary and punitive rationales in justifying less comprehensive review of acquittees at 'release hearings' than is afforded civil committees at such proceedings." 411 A.2d at 628–29 (footnote omitted). Differences such as a shift in the burden of proof and withdrawal of the right to a jury are commonly justified, in part, "by the public's interest in greater protection than it would be likely to receive by subjecting acquittees to the civil commitment process." *Id.* at 630. We concluded, therefore, that "the difference[s] between criminal and civil commitment procedures cannot be justified on purely evidentiary grounds." *Id.*

2. In our division opinion on rehearing, we summarized our analysis:

 Assuming the best case for the constitutionality of § 24–301(d), appellant argues that its partially punitive character at least dictates,

as a matter of equal protection vis-a-vis civil committees, that acquittees be released (or civilly committed) no later than the end of the maximum prison term they would have received if criminally convicted. We agree.

According to *Baxstrom* [*v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 762, 15 L.Ed.2d 620 (1966)], "[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made" (citation omitted). *Accord, Bolton* [*v. Harris*, 130 U.S.App.D.C. 1, 10, 395 F.2d 642, 651 (1968)]. On the basis of the partially punitive rationale for the criminal commitment scheme set forth earlier, *see* text and cases at note 9 *supra*, the criminal commitment scheme might survive equal protection scrutiny under *Baxstrom*, *supra*, even though the procedure for confining civil committees provides greater protection for the individual at the outset (the right to a jury and burden of proof on the government). We agree with appellant, however, that there is no basis confining an acquittee under § 24–301(d) beyond the length of the hypothetical maximum prison term, since that term marks the end of society's claim on that individual for any kind of punishment. Any longer confinement must depend, constitutionally, on a *de novo* civil commitment. *See Humphrey* [*v. Cady*, 405 U.S. 504, 510–11, 92 S.Ct. 1048, 1052–53, 31 L.Ed.2d 394 (1972)]; *Baxstrom* [, *supra*, 383 U.S. at 110–11, 86 S.Ct. at 762]; [*United States v. Brown*, 155 U.S.App.D.C. 402, 408, 478 F.2d 606, 612 (1973)].

411 A.2d at 630 (footnote omitted).

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. [*Kennedy, supra* 372 U.S. at 168–69, 83 S.Ct. at 567–68 (footnotes omitted).]

*Accord, Bell, supra,* 441 U.S. at 537–38, 99 S.Ct. at 1873. In the present case, we confront a statute for which Congress clearly had a punitive purpose.

A. *The Previous Statute and Judicial Construction*

Analysis begins with the previous statute. *See, Kennedy, supra* at 170, 83 S.Ct. at 568. Under D.C.Code 1967, § 24–301(d), a defendant who successfully interposed the insanity defense was committed automatically—and indefinitely—to a mental institution. However, in *Bolton v. Harris*, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968), the United States Court of Appeals for the District of Columbia Circuit held that automatic commitment of acquittees was unconstitutional—a denial of equal protection vis-a-vis committees. The court accordingly required that, upon a finding of not guilty by reason of insanity, an acquittee was constitutionally entitled to the equivalent of a civil commitment proceeding, which came to be known as the *"Bolton* hearing."[3] Five years later, in *United States v. Brown*, 155 U.S.App.D.C. 402, 408, 478 F.2d 606, 612 (1973), the court held that even after a *"Bolton"* hearing the disparities of treat-

ment were such that "insane criminal" commitment under D.C.Code 1967, § 24–301, having a partially punitive purpose, must be limited to the hypothetical maximum sentence (less mandatory release time), after which the acquittee would be entitled either to release or to a civil commitment proceeding. *Accord, Waite v. Jacobs*, 154 U.S.App. D.C. 281, 284–85, 475 F.2d 392, 395–96 (1973).

Apropos of *Brown*, the en banc majority concedes in the present case that the prior statute had "punitive aspects," a quality that *Bolton* was necessary to "undo." *Ante* at 369. And yet in the same paragraph the majority states that "[t]he 1970 amendments to § 301(d), enacted in response to" *Bolton*, "have not altered its original purpose," *ante* at 369, which the majority—in a nonsequitur—characterizes as nonpunitive by reference to *Hough v. United States*, 106 U.S.App.D.C. 192, 271 F.2d 458 (1959) and other pre-*Bolton* circuit court decisions. The majority, therefore, is inherently inconsistent. If, as the majority concedes, the pre-*Bolton* statute was punitive, to the point that *Bolton* was necessary to correct its unconstitutional impact, I do not see how statutory amendments "in response to *Bolton*," providing lesser protections, can be said automatically to remove the original, "punitive aspects" of that statute. The question remains: do the 1970 amendments modifying *Bolton* erase the punitive purpose of the previous statute?

B. *The Present Statute and Its Construction*

1. Legislative history confirms that, in amending § 24–301(d) in 1970, Congress held on to its original intent to punish the criminal offender, if not by conviction and imprisonment then by indefinite confinement in a mental institution. The overriding concern of the House of Representa-

---

**3.** In reaching this result, the court relied on *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), and *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). The circuit court expressly modified its earlier decisions in *Overholser v. O'Beirne*, 112 U.S.App.D.C. 267, 302 F.2d 852 (1961); *Rags-*

*dale v. Overholser*, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960); and *Overholser v. Leach*, 103 U.S.App.D.C. 289, 257 F.2d 667 (1958), *cert. denied* 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959). *Bolton, supra* at 12, 395 F.2d at 653.

tives was that *Bolton* "permits dangerous criminals ... 'to have it both ways'—to escape both conviction and commitment to a hospital." House Comm. on The District of Columbia, District of Columbia Court Reform and Criminal Procedure Act of 1970, Section 207—*Insane Criminals*, at 74, H.R.Rep.No. 91–907, 91st Cong., 2d Sess. (emphasis added) (quoting *Overholser v. O'Beirne*, 112 U.S.App.D.C. 267, 276, 302 F.2d 852, 861 (1961)). The House considered the possibility that a criminal offender could get off without being either convicted or hospitalized "intolerable." *Id.* See *United States v. Jackson*, 179 U.S.App. D.C. 375, 381–82, 553 F.2d 109, 115–16 (1976).

The congressional intention in drafting the present § 24–301(d), therefore, was "to meet the objections of the *Bolton* court while preserving the principle of the *mandatory commitment* of those who escape criminal responsibility on the ground of mental abnormality." *Bethea v. United States*, D.C.App., 365 A.2d 64, 92 n.62 (1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977) (emphasis added). Congress wanted to confront the criminal defendant with a choice: conviction or "the very real possibility of prolonged therapeutic confinement." *Id.* at 90 (footnote omitted). Because "the prospect of commitment to a mental institution for an indefinite period is much less desirable than a fixed term in prison," *United States v.*

*Freeman*, 357 F.2d 606, 626 n.60 (2d Cir. 1966), Congress intended the substantial likelihood of indefinite confinement to provide an effective deterrent to those tempted to misuse the insanity defense to avoid criminal incarceration. In short, the legislative history of the 1970 amendments provides strong evidence that Congress, in overruling *Bolton*, intended to restore as much punishment under § 24–301(d), as constitutionally would pass muster.

2. More than the legislative history, the legislative result—the statute itself—reveals that Congress maintained its punishment objective.

First, the authorized procedures by which an acquittee may challenge confinement in a mental institution, D.C.Code 1973, §§ 24–301(d)(2), –(k)(1) through (6), do nothing more than institutionalize the habeas corpus procedure that already was available at the time of *Bolton*. See *Miller v. Cameron*, 118 U.S.App.D.C. 323, 324, 335 F.2d 986, 987 (1964); *O'Beirne, supra* at, 275, 302 F.2d at 860; *Ragsdale v. Overholser*, 108 U.S.App. D.C. 308, 313–14, 281 F.2d 943, 948–49 (1960); D.C.Code 1967, § 24–301(g). Procedurally, therefore, the acquittee is no better off under § 24–301 today than he or she was under the same statute before 1970. Unless the acquittee can prove he or she is not mentally ill or dangerous, confinement under § 24–301 is both automatic and indefinite.[4]

---

4. My colleagues' implication that altering the burden of proof and denying acquittees a right to jury trial are minor procedural distinctions from civil commitment, *see ante* at 372–375, is inconsistent with Congress' purpose in amending the statute to overrule *Bolton*. As this court recognized in *Bethea, supra*, imposing the burden of proof on the acquittee is a significant procedural distinction from civil commitment; it is designed to make it more difficult for the acquittee to gain freedom. *Id.* at 91–92. Indeed, where proof is often difficult to assess, *see Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979), "the allocation of the burden of proof may be outcome determinative." *Waite supra* at 284, 475 F.2d at 395.

The majority's discounting of the role of the jury when questions of mental capacity are at issue is also in direct conflict with our ruling in *Bethea, supra*, which emphasized that, despite

the impact of psychiatric testimony, it is for the jury, not the psychiatric expert, to decide the accused's mental state. *Id.* at 82–83. The majority's emphasis on the factfinder's reliance on expert testimony in accessing the accused's mental state (and thus on the lesser need for a jury) was recently rejected by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Ecker*, 177 U.S.App.D.C. 31, 543 F.2d 178 (1976), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977). There, the court upheld the trial court's refusal to release an acquittee from a mental hospital despite the recommendations of his doctors, stating, "*the district court must independently 'weigh the evidence' and make a de novo determination* that the patient will not in the reasonable future endanger himself or others." *Id.* at 40, 543 F.2d at 187 (emphasis in the original).

Second, upon confinement, acquittees are not necessarily treated the same as committees. In this jurisdiction, an individual is found not guilty by reason of insanity if "as a result of a *mental disease* or *defect* he lacked substantial capacity either to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Bethea, supra* at 79 (emphasis added). Ordinarily, this jurisdiction treats individuals suffering from a mental "defect" (*i. e.*, mental retardation) differently from the way it treats individuals suffering from a mental illness. Under civil commitment procedures, a mentally defective individual who is "not insane nor of unsound mind to such an extent to require his commitment to a hospital for the mentally ill" is committed to Forest Haven, a facility for retarded persons. D.C.Code 1973, §§ 21–1101, 32–601. In contrast, an acquittee, even if only suffering from a mental defect, is committed to a hospital for the mentally ill, Saint Elizabeths. *Id.*, § 24–301(d).

In *United States v. Jackson, supra*, the court upheld this distinction in treatment precisely because it recognized that Congress "intended that *all* defendants acquitted by reason of insanity should be distinguished from all other persons, including persons civilly committed for mental diseases or retardation." *Id.* at 381, 553 F.2d at 115 (emphasis in original). In *Jackson*, the court justified this difference in treatment on the basis that acquittees, but for their insanity plea, had been found guilty of crimes against society. *Id.* at 387, 553 F.2d at 121. Apropos of *Jackson*, this difference in treatment of certain acquittees cannot possibly be justified merely on the basis of an evidentiary presumption concerning the continuing mental condition of the acquittee. *See* note 1 *supra*. Rather, it is an express statutory provision, justified by reference to the criminality of the acquittee's prior conduct.

Third, and perhaps most telling, is another example of differing possibilities for release of acquittees and committees after confinement. When the superintendent of Saint Elizabeths Hospital certifies that a committee is cured, the individual is discharged from the hospital. D.C.Code 1973, § 21–590. In contrast, when the hospital superintendent certifies that an acquittee has recovered, the government may demand a hearing. At this hearing, if the court is not convinced that the acquittee has recovered, the court may order his or her return to the hospital even though the authorities there consider the individual well enough for release. D.C.Code 1973, § 24–301(e).

In *United States v. Ecker*, 177 U.S.App. D.C. 31, 543 F.2d 178 (1976), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977), an acquittee challenged the constitutional validity of this added hurdle—court approval—before release. Five years after a jury had found the defendant not guilty of rape and murder by reason of insanity, the superintendent of Saint Elizabeths recommended conditional release. After a hearing, despite the recommendation of the examining psychiatrists, the trial court denied the hospital's request and ordered continued hospital confinement. In upholding the statute and the trial court's decision, the federal circuit court expressly relied on the fact that Ecker had committed a violent criminal act.[5] *Id.* at 52, 543 F.2d at 199. Whether or not the hospital psychiatrists thought Ecker should be released, the trial court had a duty to protect "the public against whom the acquittee has already been shown to have committed one or more criminal acts, thus differentiating himself from the civil committee." *Id.* at 51, 543 F.2d at 198. "More importantly," the court rejected Ecker's equal protection argument based on *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), and *Humphrey v.*

5. The circuit court, more than once, has relied on the nature of the underlying offense to justify the consequences of confinement under § 24–301(d). In *United States v. Jackson, supra*, the court emphasized that the defendant had been acquitted by reason of insanity of first degree burglary and rape, in contrast with mere theft of small sums which would "not indicate excessive dangerousness." *Id.* at 387, 553 F.2d at 121.

*Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), reasoning "that the criminal conviction may justify some differences in procedural safeguards if the differences are 'limited by the nature of the defendant's crime *or the maximum sentence authorized for that crime*'" *Id.* at 51–52, 543 F.2d at 198–99 (quoting *Humphrey, supra* at 511, 92 S.Ct. at 1053) (emphasis added). Because Ecker could have been incarcerated, however, for a life sentence if not acquitted by reason of insanity, the differences in release procedures (between acquittees and committees) were therefore justifiable. Finally, the court rejected the hospital recommendation by saying that even if the hospital were correct "that a step-by-step reentry into the community [was] essential to Ecker's continued improvement," an acquittee "who has committed violent criminal acts" has "no right to treatment at the community's peril." *Id.* at 52–53, 543 F.2d 199–200.

Given the legislative history, the differences in treatment of acquittees and committees, and the judicial gloss on the statute by decisions such as *Ecker*, the majority's position that the purpose of the statute is solely to "treat[ ] and rehabilitat[e] mental patients who happen to have been acquitted of crimes by reason of insanity," *ante* at 370, is unsupportable. Acquittees are not just mental patients "who happen" to have been acquitted of crimes by reason of insanity. The fact of their criminal conduct continues to play a decisive role in the nature of their treatment and their chances for release after initial commitment. Congress and the courts have justified this

harsher treatment precisely because acquittees have committed crimes.

## C. The Relevance of the Statutory Maximum Sentence

The majority rejects the use of statutory maximum sentences to determine the maximum length of confinement under § 24–301 because such maximums have "no relationship to the purposes of mental care and treatment." *Ante* at 369. I agree. The majority states that "[t]he notion that the duration of an acquittee's hospitalization can be established by statute or court order ignores the most basic precepts of medicine and psychiatry . . . ." *Ante* at 370. Again, I agree. If the acquittee were hospitalized solely for medical reasons, I would be the first to concur that a statutory maximum for confinement based on the nature of the acquittee's criminal conduct would have no relevance or application. But the problem is—and is so clearly evident in *Ecker*—that acquittees are not confined to mental institutions for medical reasons alone. They are confined there in part because society is unwilling to allow those who have committed crimes to escape without paying for their crimes. The intent of the statute is partially punitive, and thus the procedures under § 24–301 reflect this added burden on the defendant. Because of this punitive purpose, the maximum statutory period of confinement becomes relevant, for at that point society no longer has a valid interest in continued confinement on the basis of a shortcut procedure. *Brown, supra* at 408, 478 F.2d at 612; *see Waite, supra* at 285, 475 F.2d at 396; note 2 *supra*.[6]

6. Although the foregoing discussion is sufficient to demonstrate the congressional purpose underlying D.C.Code 1973, § 24–301, I note briefly that the other *Kennedy* factors confirm the punitive intent.

By definition, confinement to a mental institution is "an affirmative disability or restraint," *id.* 372 U.S. at 168, 83 S.Ct. at 567, even more perhaps than imprisonment, *see Vitek v. Jones,* 445 U.S. 480, 493–94, 100 S.Ct. 1254, 1263–64, 63 L.Ed.2d 552 (1980), given the indefinite duration and the stigma. *See Addington, supra,* 441 U.S. at 425–26, 99 S.Ct. at 1809. Despite its use for treatment, moreover, confinement for mental illness and dangerousness as a con-

sequence of a criminal act "has historically been regarded as a punishment," *Kennedy, supra* 372 U.S. at 168, 83 S.Ct. at 567, for which the Supreme Court continually has had to write constitutional guidelines. *See, e. g., Jackson v. Indiana, supra; Humphrey, supra; Specht, supra; Baxstrom, supra.*

Criminal confinement also comes into play "only on a finding of *scienter*," *Kennedy, supra* at 168, 83 S.Ct. at 567; *see Bethea, supra* at 94 and "the behavior to which it applies is already a crime," *Kennedy, supra* at 168, 83 S.Ct. at 567, by virtue of the criminal conviction that precedes it. The statute also "promote[s] the traditional aims of punishment—retribution

### III.

Society's right to punish Michael Jones for his first offense, a misdemeanor—stealing a coat—has long since expired. As every day passes he is denied equal protection of the laws.[7] Michael Jones should be released unless civilly committed.

and deterrence," *id.*, for, as already indicated, Congress and this court have noted a desire to prevent the misuse of the insanity defense by making the consequences more severe than *de novo* civil commitment. In addition, criminal confinement at a mental institution serves other goals of punishment, incapacitation and rehabilitation. *See United States v. Brown*, 381 U.S. 437, 458, 85 S.Ct. 1707, 1720, 14 L.Ed.2d 484 (1965) ("Punishment serves several purpose: retributive, rehabilitative, deterrent—and preventive"). *See generally*, J. Vorenberg, Criminal Law & Procedure 44–57 (1975).

Finally, for reasons already discussed, I do not believe there is a wholly nonpunitive, "alternative purpose," *Kennedy, supra*, 372 U.S. at 168–69, 83 S.Ct. at 567–68, assignable to § 24–301; but even if the purposes assigned by the majority—treatment of the acquittee and protection of society—were altogether nonpunitive, the indefinite confinement of Michael Jones for stealing a coat is well beyond any public protection gloss on the statute's purpose. It is one thing to keep an acquittee of murder and rape confined for life, *see Ecker, supra*, as he would be under appellant's theory here, for those are life-sentence crimes. But society has no "protection" interest in confining Michael Jones indefinitely for stealing a coat, a misdemeanor punishable by maximum confinement for one year.

7. When a court confronts different procedural safeguards afforded to different classes of individuals committed to mental institutions, concerns of equal protection and due process become interrelated. *See Jackson v. Indiana, supra* 406 U.S. at 731, 92 S.Ct. at 1854; *cf. Humphrey, supra*, 405 U.S. at 511, 92 S.Ct. at 1053 (1972) (noting with favor the state court's consideration of Equal Protection Clause as relevant to procedural due process analysis); *Specht, supra* 386 U.S. at 608, 87 S.Ct. at 1211 (commitment proceedings for sex offenders subject both to Equal Protection and Due Process Clauses). In evaluating equal protection for the acquittee, I have not reached the question of due process as an independent concern, although there is a serious question here. I note, moreover, that any effort to reduce the procedural safeguards afforded to civil committees, while possibly resolving equal protection problems, would raise serious questions of due process for that class of individuals.